**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| Andrew Thomasson, | § | Civil Action No. 5:26-cv-06432 |
| | § | |
| Plaintiff, | § | **Jury Trial Demanded** |
| | § | |
| v. | § | |
| | § | |
| Flavia Okamoto and Does 1–25, | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT AND JURY DEMAND

Andrew Thomasson brings this action against Flavia Okamoto and Does 1–25 and alleges as follows:

## NATURE OF THE ACTION

1. Mr. Thomasson put his cell phone number on the National Do Not Call Registry (the Registry) in 2012 so that businesses would stop soliciting him by phone. More than 11 years later, in about two weeks in March and April 2023, Ms. Okamoto and people acting for her sent him 11 unsolicited text messages that pitched real estate services to homeowners facing foreclosure.

2. Mr. Thomasson sues under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, its implementing regulations, 47 C.F.R. § 64.1200, and Tex. Bus. & Com. Code § 305.053. He seeks statutory damages for each violation and increased damages because the violations were willful, knowing, or intentional.

3. Congress enacted the TCPA because "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5), 105 Stat. 2394).

## PARTIES

4. Mr. Thomasson is a natural person. At all times relevant to this complaint, he lived in San Antonio, Bexar County, Texas, and he received the messages described below there.

5. Flavia Okamoto is a natural person who lives in Georgetown, Williamson County, Texas. She may be served with process at 223 North College Street, Georgetown, Texas 78626-4102, or wherever she may be found.

6. Does 1–25 (the Does) are persons or entities whose names Mr. Thomasson does not yet know. They include the person or persons who sent the messages signed "Jordan" and "Jordan Davis," and anyone who directed, authorized, or profited from those messages. Mr. Thomasson will amend this complaint to state their true names when he learns them.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 because they arise under the laws of the United States.

8. This Court has supplemental jurisdiction over the Texas claim under 28 U.S.C. § 1367(a) because it arises from the same messages as the federal claims and forms part of the same case or controversy.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here. Mr. Thomasson received each

message on his cell phone in Bexar County, which lies in the San Antonio Division. 28 U.S.C. § 124(d)(4).

10. This Court has personal jurisdiction over Ms. Okamoto because she lives in Texas. It has personal jurisdiction over the Does because they directed the messages at a Texas resident in Texas, using telephone numbers with a Texas area code, and the claims arise from those contacts.

## STATUTORY FRAMEWORK

11. Congress directed the Federal Communications Commission (FCC) to adopt rules that protect residential telephone subscribers from telephone solicitations to which they object. 47 U.S.C. § 227(c)(1). The FCC's rules bar any person from initiating a telephone solicitation to a residential subscriber who has registered on the Registry, and a registration must be honored indefinitely unless the consumer cancels it or the administrator removes the number. 47 C.F.R. § 64.1200(c)(2).

12. A separate rule forbids anyone from initiating a call for telemarketing purposes to a residential subscriber unless the caller has instituted procedures for keeping an internal do-not-call list. Those procedures include a written policy, training for the people who make the calls, and a requirement that callers give their own names, the name of the person or entity on whose behalf they call, and a telephone number or address for that person or entity. 47 C.F.R. § 64.1200(d)(1), (2), (4).

13. These protections cover text messages and calls to wireless numbers. 47 C.F.R. § 64.1200(e). A cell phone that its owner uses for personal, family, and household purposes is a residential line. *See Callier v. Finish Line Inc.*, No. 3:25-CV-2331-B-BK, 2026 U.S. Dist. LEXIS 203594, at *14–17 (N.D. Tex. Aug. 19, 2026) (Toliver, R.), *rep. & rec. adopted*, 2026

U.S. Dist. LEXIS 202047 (N.D. Tex. Sept. 8, 2026) (Boyle, J.); *Duron v. Kings Cap. Holding LLC*, No. 3:25-cv-149, 2026 U.S. Dist. LEXIS 6340, at *13 (W.D. Tex. Jan. 13, 2026) (Enriquez, J.), *rep. & rec. adopted*, 2026 U.S. Dist. LEXIS 23949 (W.D. Tex. Feb. 5, 2026) (Guaderrama, D.).

14. A person who receives more than one telephone call within any 12-month period from or on behalf of the same entity in violation of these rules may sue. The person may recover actual monetary loss or up to $500 for each violation, whichever is greater, and the Court may increase the award to up to three times that amount if the violation was willful or knowing. 47 U.S.C. § 227(c)(5).

15. A text message is a telephone call under section 227(c)(5). *See Callier*, 2026 U.S. Dist. LEXIS 203594, at *5–14.

16. The TCPA also forbids using an automatic telephone dialing system to send a message to a cell phone without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). For telemarketing messages, that consent must be in a signed writing. 47 C.F.R. § 64.1200(a)(2), (f)(9). A device is an automatic telephone dialing system if it has the capacity either to store a telephone number using a random or sequential number generator or to produce a telephone number using a random or sequential number generator. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 398 (2021).

17. Texas law gives a private right of action to a person who receives a communication that violates 47 U.S.C. § 227 or a regulation adopted under it. The person may recover the greater of $500 for each violation or actual damages, and the Court may increase that award to not more than the greater of $1,500 for each violation or three times actual damages if the defendant acted knowingly or intentionally. TEX. BUS. & COM. CODE § 305.053(a)–(c).

## FACTUAL ALLEGATIONS

### A. Mr. Thomasson's cell phone is a residential line that has been on the Registry since 2012.

18. Mr. Thomasson's cell phone number ends in 5180 (XXX-XXX-5180). He has had the number for more than 20 years.

19. The cell phone is Mr. Thomasson's only telephone; he has no landline. He is its only user, and he uses it only for personal, family, and household purposes. It is his primary way to communicate with friends and family.

20. The number is assigned to a family plan with his wireless carrier. The account is in Mr. Thomasson's name, and he pays for it from his personal bank account. The number has no connection to any business.

21. On February 21, 2012, Mr. Thomasson registered the number on the Registry to obtain solitude from unwanted telemarketing calls and text messages. It has remained on the Registry ever since. The registration came more than 11 years before the first message described below.

22. Mr. Thomasson never gave his cell phone number to Ms. Okamoto or to anyone acting for her, and he never published it.

### B. Ms. Okamoto and her associates sent 11 unsolicited messages in about two weeks.

23. Between March 17 and April 1, 2023, Mr. Thomasson's cell phone received 11 text messages from two telephone numbers: seven SMS messages from (512) 537-5800 (the office number) and four iMessages from (512) 591-4521 (the mobile number). The table below lists them in the order in which they arrived. Exhibit 1 reproduces each message as it appeared on his phone.

| No. | Date | Time | Sending number | Protocol | Characters | Segments |
|---|---|---|---|---|---|---|
| 1 | March 17, 2023 | 12:15:02 p.m. | (512) 537-5800 | SMS | 466 | 4 |
| 2 | March 18, 2023 | 11:30:02 a.m. | (512) 537-5800 | SMS | 384 | 3 |
| 3 | March 21, 2023 | 4:49:01 p.m. | (512) 537-5800 | SMS | 218 | 2 |
| 4 | March 25, 2023 | 11:30:03 a.m. | (512) 537-5800 | SMS | 384 | 3 |
| 5 | March 27, 2023 | 3:26:01 p.m. | (512) 537-5800 | SMS | 218 | 2 |
| 6 | March 28, 2023 | 11:21:46 a.m. | (512) 591-4521 | iMessage | Image | 1 |
| 7 | March 28, 2023 | Not shown | (512) 591-4521 | iMessage | 60 | 1 |
| 8 | March 28, 2023 | Not shown | (512) 591-4521 | iMessage | 110 | 1 |
| 9 | March 28, 2023 | Not shown | (512) 591-4521 | iMessage | 103 | 1 |
| 10 | March 29, 2023 | 3:45:01 p.m. | (512) 537-5800 | SMS | 255 | 2 |
| 11 | April 1, 2023 | 9:30:01 a.m. | (512) 537-5800 | SMS | 255 | 2 |

24. The first message, sent from the office number on March 17, 2023, identifies the sender as "Jordan." It says that the sender helps "families who have fallen behind on their mortgage," and it closes, "Looking forward to hearing back from you soon." The office number sent six more messages. Each identifies the sender only as "Jordan" or "Jordan Davis." Messages 2 and 4 are identical, messages 3 and 5 are identical, and messages 10 and 11 are identical.

25. Messages 2 and 4 say that the sender helps "homeowners in situations like foreclosure to get out of difficult situations and avoid auction sale," that "[t]he most important thing here is time," and that an auction is scheduled. Messages 3 and 5 say that the sender is "following up with you to see if I can be of any assistance." Messages 10 and 11 ask whether the recipient has "gotten your foreclosure resolved with your home."

26. Message 6, sent from the mobile number, is a flyer. It bears a photograph, the name "Flavia Okamoto," and the list "We Buy," "We Sell," "We Owner Finance," "We Stop

Foreclosure," and "We Short Sale." It gives contact information as "O 512.537.5800 M 512.591.4521." Mr. Thomasson replied with a street address and nothing else. The mobile number then sent messages 7, 8, and 9, which offered to buy a home "[c]ash as is" and to "accommodate creative financing."

**C. Ms. Okamoto is the source of the messages.**

27. The flyer lists (512) 537-5800 as Ms. Okamoto's office number ("O") and (512) 591-4521 as her mobile number ("M"). Ms. Okamoto therefore holds out both numbers as her own.

28. On information and belief, Ms. Okamoto sent messages 6 through 9 from her mobile number.

29. On information and belief, Ms. Okamoto, or a person she employs or authorizes, sent messages 1 through 5, 10, and 11 from her office number to generate business for her. The office number is the business line on her own flyer. The messages offer "strategies" to homeowners facing foreclosure, which is the subject of the services her flyer advertises: "We Stop Foreclosure" and "We Short Sale." And the office number kept sending messages 10 and 11 after Ms. Okamoto's mobile number sent messages 6 through 9 to the same recipient, which shows that the two numbers served one effort. On information and belief, she knew of the office-number messages and accepted their benefit.

30. None of the seven office-number messages names a business, and none states a telephone number or address at which the sender or the sender's principal could be reached. Each gives only a first name or a first and last name.

31. The messages were sent to promote transactions from which the senders expected to profit: paid help with a mortgage or foreclosure, or the sale of the home to the sender. On information and belief, Ms. Okamoto and the Does earn money from those transactions.

Each message therefore encouraged Mr. Thomasson to purchase property, goods, or services. *See* 47 U.S.C. § 227(a)(4).

**D. The office-number messages were sent by automated means.**

32. Each of the seven office-number messages arrived one to three seconds after the start of a minute: at 12:15:02 p.m., 11:30:02 a.m., 4:49:01 p.m., 11:30:03 a.m., 3:26:01 p.m., 3:45:01 p.m., and 9:30:01 a.m. Messages 2 and 4 arrived a week apart, both on a Saturday, at 11:30:02 a.m. and 11:30:03 a.m.

33. Three pairs of messages (Nos. 2 and 4, Nos. 3 and 5, and Nos. 10 and 11) are identical word for word, although each pair was sent days apart. The messages read as templates, and they repeat the same grammatical slips, such as "We offer few different strategies."

34. The follow-up messages ignored Mr. Thomasson's reply. After he replied "Thanks for the info," messages 3 and 5 opened with a fresh greeting and asked whether the sender could "be of any assistance," as though he had not replied.

35. On information and belief, the office-number messages were sent through software that stores telephone numbers and sends scripted messages on a schedule, without a person typing and sending each one, and that has the capacity to store or produce telephone numbers using a random or sequential number generator, including to select the order in which stored numbers are messaged.

### E. Each office-number message was longer than 160 characters.

36. A standard SMS message can carry up to 160 characters in GSM-7 encoding. A longer message is divided into concatenated segments of up to 153 characters each. On information and belief, each segment is separately transmitted to and delivered on the recipient's phone, even though the phone displays the segments together as one message.

37. Each of the seven office-number messages is longer than 160 characters, as the table above shows. On information and belief, they reached Mr. Thomasson's phone as 18 segments in all: four for message 1, three each for messages 2 and 4, and two each for messages 3, 5, 10, and 11.

38. Mr. Thomasson pleads the segment count as an alternative measure of the violations. On that measure, each segment is a separate call and a separate violation. *See Connor v. Servicequick Inc.*, No. 1:24-cv-02286-CNS-NRN, 2025 U.S. Dist. LEXIS 199578, at *2–3 (D. Colo. Oct. 8, 2025).

## CONSENT AND ESTABLISHED BUSINESS RELATIONSHIP

39. Mr. Thomasson never asked Ms. Okamoto or anyone acting for her to send him messages. He never inquired about, applied for, or bought any product or service from them, and he never signed anything agreeing to receive advertisements or telemarketing messages from them by text or otherwise.

40. Before message 1 arrived, Mr. Thomasson had never communicated with Ms. Okamoto or the Does, and no established business relationship existed between them.

41. Two unsolicited messages, messages 1 and 2, reached Mr. Thomasson before he sent anything to anyone. Those two messages alone are more than one call within a 12-month period.

42. Mr. Thomasson later sent two messages of his own, both shown in Exhibit 1. On March 18, 2023, at 1:27:06 p.m., after receiving messages 1 and 2, he replied "Thanks for the info." The reply asked for nothing, and the office number went on sending its scripted messages. On March 28, 2023, after receiving the flyer, he replied with a street address and nothing else. Neither reply requested an offer or a service, applied for anything, or agreed to receive more messages.

43. Mr. Thomasson's registration on the Registry was his standing notice to every telemarketer, including Ms. Okamoto and the Does, that he did not want telephone solicitations. Ms. Okamoto and the Does did not have his prior express written consent to send any message to his cell phone, and none of the messages was sent for an emergency purpose.

## STANDING AND INJURY

44. Mr. Thomasson suffered a concrete injury from the messages. The Fifth Circuit has held that a person who receives an unsolicited text advertisement suffers a nuisance that is a cognizable injury in fact, because it closely resembles the harm that public nuisance has long redressed. *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690–93 (5th Cir. 2021).

45. Mr. Thomasson registered his number on the Registry to protect his privacy and to be left alone by telemarketers. Ms. Okamoto and the Does ignored that choice. Between March 17 and April 1, 2023, they sent 11 marketing messages to the phone he keeps for personal and family communication, including messages on three Saturdays.

46. The messages harmed Mr. Thomasson in ways particular to him. Each message arrived on his own phone and interrupted him, and he had to look at and read each one to learn what it was. He replied twice, on March 18 and March 28, 2023. Each message also drained his phone's battery.

47. These harms are not shared with the public at large. Together they are the nuisance and invasion of privacy that Congress sought to prevent when it enacted the TCPA, and they are why Mr. Thomasson may sue.

## WILLFUL AND KNOWING VIOLATIONS

48. Ms. Okamoto and the Does violated the TCPA and Texas law willfully, knowingly, and intentionally. They sent 11 messages in about two weeks on a repeating schedule. They used first names in place of a business name, which kept the identity of the business from the recipient. They pressed a homeowner with a deadline, telling him that "[t]he most important thing here is time." And Ms. Okamoto added her own mobile number to the effort 11 days after the office-number messages began.

49. On information and belief, Ms. Okamoto and the Does did not check the Registry before sending the messages or, if they checked, sent the messages anyway.

## CLAIMS FOR RELIEF

### COUNT ONE

**Use of an automatic telephone dialing system, 47 U.S.C. § 227(b)(1)(A)(iii)**

*(Against Ms. Okamoto and Does 1–25)*

50. Mr. Thomasson incorporates the preceding paragraphs.

51. Ms. Okamoto and the Does used an automatic telephone dialing system to send messages 1 through 5, 10, and 11 to Mr. Thomasson's cell phone. This count concerns only those seven messages from the office number.

52. Ms. Okamoto and the Does did not have Mr. Thomasson's prior express consent, written or otherwise, to send those messages.

53. Each of the seven messages violated 47 U.S.C. § 227(b)(1)(A)(iii). Mr. Thomasson is entitled to $500 for each violation. 47 U.S.C. § 227(b)(3). Because Ms. Okamoto and the Does acted willfully or knowingly, the Court may increase that award to $1,500 for each violation. *Id.*

54. Alternatively, if each segment counts as a separate call, the seven messages were 18 separate violations.

**COUNT TWO**

**Calls to a number on the National Do Not Call Registry, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2)**

*(Against Ms. Okamoto and Does 1–25)*

55. Mr. Thomasson incorporates the preceding paragraphs.

56. Mr. Thomasson is a residential telephone subscriber whose number has been on the Registry since February 21, 2012.

57. Ms. Okamoto and the Does initiated 11 telephone solicitations to that number between March 17 and April 1, 2023, in violation of 47 C.F.R. § 64.1200(c)(2). Each message encouraged Mr. Thomasson to buy or use the senders' services. 47 U.S.C. § 227(a)(4). No exemption or defense applies, for the reasons stated above.

58. Mr. Thomasson received more than one call within a 12-month period, so he may sue under 47 U.S.C. § 227(c)(5). He is entitled to $500 for each violation, and the Court may increase the award to $1,500 for each willful or knowing violation. *Id.*

59. Alternatively, if each segment counts as a separate call, the messages were 22 separate violations: 18 segments from the office number and four messages from the mobile number.

## COUNT THREE

**Failure to institute internal do-not-call procedures, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d)(1)–(2)**

*(Against Ms. Okamoto and Does 1–25)*

60. Mr. Thomasson incorporates the preceding paragraphs.

61. Each of the 11 messages was a call for telemarketing purposes to a residential telephone subscriber.

62. On information and belief, Ms. Okamoto and the Does had not instituted the procedures that 47 C.F.R. § 64.1200(d) requires before making telemarketing calls. They had no written do-not-call policy, and they had not trained the people who sent the messages in the use of an internal do-not-call list. The messages are consistent with that: they went out under first names, with no business name to which a do-not-call request could be directed.

63. Each of the 11 messages therefore violated 47 C.F.R. § 64.1200(d)(1) and (2). Mr. Thomasson is entitled to $500 for each violation under 47 U.S.C. § 227(c)(5), and the Court may increase the award to $1,500 for each willful or knowing violation. Alternatively, on the segment count, the messages were 22 separate violations.

## COUNT FOUR

**Failure to identify the caller, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d)(4)**

*(Against Ms. Okamoto and Does 1–25)*

64. Mr. Thomasson incorporates the preceding paragraphs.

65. Each of the seven office-number messages identifies the sender only as “Jordan” or “Jordan Davis.” None states the name of the person or entity on whose behalf it was sent, and none states a telephone number or address at which that person or entity could be reached.

66. Each of those seven messages therefore violated 47 C.F.R. § 64.1200(d)(4). Mr. Thomasson is entitled to $500 for each violation under 47 U.S.C. § 227(c)(5), and the Court may increase the award to $1,500 for each willful or knowing violation. Alternatively, on the segment count, the seven messages were 18 separate violations.

## COUNT FIVE
## Violation of Tex. Bus. & Com. Code § 305.053
*(Against Ms. Okamoto and Does 1–25)*

67. Mr. Thomasson incorporates the preceding paragraphs.

68. Ms. Okamoto and the Does originated the messages, and Mr. Thomasson received them. As alleged in Counts One through Four, each message violated 47 U.S.C. § 227 or a regulation adopted under it, and each therefore violated Tex. Bus. & Com. Code § 305.053(a).

69. Mr. Thomasson is entitled to the greater of $500 for each violation or his actual damages. TEX. BUS. & COM. CODE § 305.053(b). Because Ms. Okamoto and the Does acted knowingly or intentionally, the Court may increase the award to not more than the greater of $1,500 for each violation or three times his actual damages. *Id.* § 305.053(c).

70. Alternatively, if each segment counts as a separate violation, the messages were 22 separate violations.

## REQUESTED RELIEF

Mr. Thomasson asks the Court to enter judgment for him and against Ms. Okamoto and Does 1–25, jointly and severally, and to award him:

(a) statutory damages of $500 for each violation of 47 U.S.C. § 227(b);

(b) statutory damages of $500 for each violation of the regulations enforced under 47 U.S.C. § 227(c)(5);

(c) an increase of those awards to $1,500 for each violation that the Court finds willful or knowing, 47 U.S.C. § 227(b)(3), (c)(5);

(d) the greater of $500 for each violation or actual damages under Tex. Bus. & Com. Code § 305.053(b), increased under section 305.053(c) for each knowing or intentional violation;

(e) costs of court;

(f) prejudgment and postjudgment interest as the law allows; and

(g) any other relief that the Court finds just.

**JURY DEMAND**

Under Federal Rule of Civil Procedure 38(b), Mr. Thomasson demands a trial by jury on all issues that a jury may try.

Date: October 6, 2026

Respectfully submitted.

/s/ Francesca A. Di Troia
Francesca A. Di Troia (SBN 24097596)
KRW LAWYERS
701 Brazos Street, Suite 710
Austin, Texas 78701
Telephone: (210) 490-1109
Fax: (210) 490-8372
Francesca@KRWlawyers.com
Attorney for Plaintiff Andrew Thomasson.